# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**UNITED STATES OF AMERICA,**           )
                                        )
                                        )
                                        )
**v.**                                  )          **Criminal No. 13-10077-DJC**
                                        )
**COREY NORRIS,**                       )
                                        )
    **Defendant.**                      )
                                        )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **May 28, 2014**

## I.      Introduction

Defendant Corey Norris ("Norris") has been charged in an indictment, filed on March 21, 2013, with "conspiracy to sex traffic a child" in violation of 18 U.S.C. § 1594(c) (Count I); sex trafficking of a child in violation of 18 U.S.C. § 1591(a), (b)(1) (Count II); and transportation of a minor with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a) (Count III).   Norris has now moved to dismiss the indictment for a violation of Fed. R. Civ. P. 5(a), D. 80, and to suppress his statements to law enforcement agents on March 29, 2013, the date of his arrest, on the grounds that his waiver of Miranda rights was not knowingly, intelligently and voluntarily made and that the statements were not voluntary.  D.  82.  In a supplemental filing to his motion to suppress, D. 97, Norris also asserts that another basis for suppression is the "clear violation of Norris's Sixth Amendment right to counsel."  D. 82 at 1. Upon consideration of the motion and after evidentiary hearing held over the course of February

11, 2014, March 11, 2014 and April 9, 2014, the Court DENIES the motion to dismiss, D. 80, and DENIES the motion to suppress, D. 82.

## II.    Factual Findings

The relevant facts are as follows based upon the testimony of Special Agent Eric Weindorf of the U.S. Department of Homeland Security, Immigrations and Customs Enforcement ("Weindorf"), Boston Police Department ("BPD") Detective Kara Connolly ("Connolly") who testified on March 11, 2014 and Norris who testified on March 11, 2014 and April 9, 2014, D. 103, 111, and the various exhibits admitted during the course of the suppression hearing.

### A.    Investigation of Norris and Others Leads to Indictment for Sex Trafficking

Weindorf was the lead federal investigator and Connolly the lead BPD investigator in an investigation of Norris, Darian Thomson and Vanessa Grandoit for human trafficking.  3/11/14 Weindorf testimony at 8-9; 3/11/14 Connolly testimony at 85.  This investigation began in December 2012.  3/11/14 Weindorf testimony at 8.  The investigation began with the interview of the child victim, a subject who had raped the victim in Rhode Island and focused on three people, including Norris, who were allegedly involved in the trafficking of this child in Rhode Island.  3/11/14 Weindorf testimony at 9.  The investigation lead to photographs and video of the victim and the three individuals, including Norris, at a hotel in Rhode Island where the child was allegedly assaulted.  3/11/14 Weindorf testimony at 10.

A federal grand jury returned an indictment for sex trafficking charges against Norris and two co-defendants, Thomson and Grandoit, on March 21, 2013.  D. 3.[1]  This Court issued arrest warrants for the three defendants on the same day.  D. 4.  The agents initially planned to locate

---

[1] The original indictment has now been superseded by a Superseding Indictment filed on May 15, 2014 which charges Norris and four other defendants.  D. 114

the three defendants and attempt to arrest them at the same time.  3/11/14 Weindorf testimony at 11.

### B.  Law Enforcement Attempts to Locate and Arrest Norris

On Tuesday, March 26, 2013, with coordination between the federal agents and BPD, teams of law enforcement officers attempted to locate and arrest the defendants.  3/11/14 Weindorf testimony at 12.  Weindorf and Connolly were part of the team attempting to locate and arrest Norris, but attempts to locate him were unsuccessful at that time.  Id.; 3/11/14 Connolly testimony at 86.  Their team went to the Dorchester residence of Norris's grandmother, an address previously associated with Norris, but he was not there.  3/11/14 Connolly testimony at 87.  The agents explained to Norris's grandmother and brother that they had an arrest warrant for Norris.  3/11/14 Weindorf testimony at 12-13.  The agents left their contact information and asked them to contact them if Norris returned.  Id. at 13.  The agents checked other addresses associated with Norris, but to no avail.  Id.; 3/11/14 Connolly testimony at 88.  Norris having previously been seen over the prior weekend getting out of a rental car, the agents obtained a search warrant to use GPS tracking to locate the vehicle.  3/11/14 Weindorf testimony at 13-14.  This information revealed that the rental car was traveling in the Manchester, New Hampshire area, but further investigation revealed that the vehicle had been rented by someone else, not related to this investigation.  Id. at 14.

In a further attempt to locate Norris, Weindorf entered the arrest warrant in the NCIC system so that law enforcement nationwide would be alerted to the warrant if Norris was stopped or arrested elsewhere and he provided the warrant information to the Boston Region Intelligence Center and the Massachusetts State Police fusion center for the same purpose.  Id. at 15; 3/11/14

Connolly testimony at 87-88.  As of Friday, March 29, 2013, the agents had not yet located Norris.

### C.  Norris is Arrested by BPD on Friday, March 29, 2013

On the afternoon of March 29, 2013, a BPD narcotics detective, who had not been involved in the investigation of Norris and the others, contacted Weindorf to inform him that the BPD had located Norris and arrested him[2] in Roslindale on the federal warrant.  3/11/14 Weindorf testimony at 16, 17, 54.  The BPD had taken Norris to the West Roxbury E-5 police station.  Id. at 20.  Weindorf initially thought that he received this call sometime around 3 p.m., id. at 16, 53, but upon review of the BPD arrest report (indicating an arrest at 2:00 p.m. and booking at 2:05 p.m.), id. at 53; Exh. E, and the fact that he had contacted the U.S. Attorney's Office around 2:30 p.m., id. at 54, he agreed that he had received this call before 3 p.m.  Id. After this call, Weindorf reached out to the U.S. Attorney's Office, eventually making contact with the duty AUSA.  In their initial call, the AUSA and Weindorf discussed how long it would take the agents to get Norris to the federal courthouse for his initial appearance.  Considering that Norris would have to be processed by BPD, then Weindorf, after having traveled from his office in downtown Boston to West Roxbury, would have to take Norris through a federal booking procedure at the JFK Building and then transport him to the U.S. Marshal's holding facility at the federal courthouse, Weindorf estimated that the process, including allowing for Friday afternoon traffic, would take three hours for the agents to get Norris to the courthouse.  Id. at 18-19, 21.[3]

---

[2] Norris was arrested along with Zania Mohamed whom Norris claimed, later during the interview with Weindorf and Connolly, was his wife.  3/11/14 Weindorf testimony at 47.

[3] Weindorf testified that the part of the federal booking process not covered by BPD booking is the entry of fingerprints into the federal query system and the taking of a DNA swab.  3/11/14 Weindorf testimony at 21-22, 64-66; Exhibit J, K; 3/11/14 Connolly testimony at 92.  Moreover, the agency's policy is that these procedures must occur before a defendant's initial appearance in court. 3/11/14 Weindorf testimony at 25.  Weindorf also understood the U.S. Marshal's policy that prisoners would not be accepted into its holding facility after 3 p.m. and should be lodged in a federal detention location until the next day.  3/11/14 Weindorf testimony at 25; Exh. L.

When the AUSA called Weindorf back, he informed him that the magistrate judge had authorized lodging for Norris over the weekend and would schedule his initial appearance on Monday, April 1, 2013. Id. at 27-28, 58-59. There was no mention by the AUSA about whether an attorney had been appointed for Norris. Id. at 28, 58, 60. En route to West Roxbury, Weindorf also called Connolly to inform her of Norris's arrest. Id. at 19; 3/11/14 Connolly testimony at 88-89. Although with BPD, Connolly did not know that Norris would be arrested that day and she had not previously spoken to the BPD officers who had arrested him. 3/11/14 Connolly testimony at 89.

Weindorf and Connolly arrived at the E-5 police station at about the same time. 3/11/14 Weindorf testimony at 28. BPD had conducted its booking of Norris; neither Weindorf nor Connolly was involved in this process. Id. at 29, 68; 3/11/14 Connolly testimony at 92. Although the booking form indicated that Miranda rights had been read to him during booking (and, according to Connolly, this was standard procedure for BPD bookings) and evidences what appears to be his signature, Exh. E, Norris denied that they were read to him during booking and that he was just told to sign the booking form. 3/11/14 Norris testimony at 143. Given that Norris's initial appearance would now not occur until Monday, Weindorf did not conduct the federal booking on Friday since there was now "no rush" to do so and he was the only federal agent at the police station and he would need a second agent to transport Norris back to the JFK building to do so. 3/11/14 Weindorf testimony at 29, 63.

After his BPD booking, Connolly observed Norris in the holding cell. 3/11/14 Connolly testimony at 96. She did not observe him sleeping and although he might have asked her what was going on, she did not recall him asking about getting bail, wanting a lawyer or when he was going to court, 3/11/14 Connolly testimony at 119-20, although Norris claimed that when he

asked her about bail and when he was going to court she responded that he would have to talk to them first. 3/11/14 Norris testimony at 145. When asked if he was willing to speak to the officers, Norris indicated that he was willing do so. 3/11/14 Connolly testimony at 97. He was escorted by Connolly and another law enforcement officer, handcuffed to an interview room. Id.[4] During the walk from the holding cell, Connolly observed that Norris had no difficulty with his coordination or with walking. 3/11/14 Connolly testimony at 98.

### D. After Acknowledging and Waiving His Miranda Rights, Norris Speaks with Weindorf and Connolly

In the interview room, Weindorf and Connolly sat on one side and Norris sat on the other side. Id. at 31, 69; 3/11/14 Connolly testimony at 97. The officers were not armed at the time, id. at 31-32; 3/11/14 Connolly testimony at 98, and although both of Norris's hands were initially handcuffed, they removed one of the handcuffs to allow him to use a pen. 3/11/14 Weindorf testimony at 31; 3/11/14 Connolly testimony at 98.

The interview began just before 4 p.m. 3/11/14 Connolly testimony at 98, 122. Weindorf identified himself and that he had been arrested on a warrant for sex trafficking. 3/11/14 Weindorf testimony at 31, 77; 3/11/14 Norris testimony at 145-46 (acknowledging that agent told him about the federal arrest warrant, but not the charges). Weindorf and Connolly conducted the interview in a normal, conversational tone, with no yelling or threatening. 3/11/14 Connolly testimony at 99. The agent informed him that he wanted to discuss the circumstances giving rise to his arrest, but that he would not do so until advising him of his rights. 3/11/14 Weindorf testimony at 32. Although Norris denies that he did so, 4/9/14 Norris testimony at 30, both Weindorf and Connolly testified that Weindorf read Norris his Miranda rights from a

---

[4] Connolly could not recall if Weindorf accompanied her to the holding cell to get Norris, but she knew another law enforcement officer was with her since she could not bring someone out of a cell alone. 3/11/14 Connolly testimony at 119. Norris testified that it was Connolly that came to the holding cell. 3/11/14 Norris testimony at 144.

statement of rights form.  Id. at 33; Exh. F.  The agent read from one form and gave Norris an identical form to initial as he read the rights.  Id. at 73.[5]  He read each right from the form and had Norris acknowledge that he understood each right by initialing next to each one.  Id. at 33-34, 75; Exh. F (documenting "CN," Norris's initials next to each right). Norris acknowledged that he did initial each right, but "signed it real quick to get it over with."  3/11/14 Norris testimony at 147.  At the bottom of the statement of rights form, there was a waiver provision.  Id. at 34.  Weindorf testified that did not read the waiver section to him (and Connolly did not specifically remember him reading Norris the waiver form, 3/11/14 Connolly testimony at 127), but pointed it out to him and asked Norris to read it and that if he wanted to speak to the agent and detective, then he would sign it and they would speak with him.  Id. at 75-76, 77.  Weindorf observed him read the waiver form.  3/11/14 Weindorf testimony at 75.   In this section, Weindorf printed Norris's name and Norris signed the waiver form.  Id. at 34; 3/11/14 Connolly testimony at 100.  Norris testified that he did sign the waiver form, but that he did not have an opportunity to read it and he just signed it because "I thought I was going to get out, so I was just trying to get it over with."  3/11/14 Norris testimony at 147-48.  His signature on the waiver form was witnessed (and signed) by Weindorf and Connolly.  3/11/14 Weindorf testimony at 34; 3/11/14 Connolly testimony at 100.  During the interview, neither officer told him that he needed to sign the forms so he could get a lawyer or be transported to court.  3/11/14 Connolly testimony at 101-02.

After signing the Miranda waiver form, Weindorf and Connolly spoke to Norris about knowing the victim in the case, how he had met her and whether he had ever been to Rhode

---

[5] Connolly said that her practice was also to use two sheets, but she thought that Weindorf was reading from one Miranda form and twisted his body so he could read from the Miranda form in front of Norris.  3/11/14 Connolly testimony at 124-25.  Both law enforcement agents testified that Weindorf read every right to Norris and had him initial each right.   3/11/14 Weindorf testimony at 33-34, 75; 3/11/14 Connolly testimony at 125.

Island with her.  Id. at 36-38; Exh. T.  Norris provided some details about the vehicle he was in when he met the victim the previous December, having traveled to Rhode Island.  He initially denied having been at the hotel in Rhode Island, but when shown a hotel surveillance photograph, he admitted that he had been there with the victim and that Grandoit had driven him down there.  Id. at 41.  He also explained that he asked her to "post up" (i.e., post online that she was available for prostitution).    Id. at 41.    During the interview, Norris identified two photographs of a female in underwear as photos of the victim.  Id. at 42.  When shown a photograph of the person charged with raping the victim in Rhode Island, Norris said that he did not recognize him.  Id. at 43.  However, when Weindorf told him that the individual that victim had met up with was not a police officer (as the victim had previously told the agents in the investigation that she had been told), Norris reacted by said that he knew he was not a cop and that he had told Grandoit that he was not a cop.  Id. at 43-44.  Initially, Norris denied that Thomson had traveled with them to Rhode Island, but then admitted that Thomson had been with them after Connolly showed him a police report in which Thomson had blamed another criminal incident on "Case," an alias of Norris's.  Id. at 45.

During the course of the interview, Weindorf told Norris that the victim in the case was still missing, but denied suggesting that she was dead.  Id. at 79; 3/11/14 Connolly testimony at 133.  Norris appeared upset at this information.  Id.  Weindorf told Norris that he was facing felony charges and faced fifteen years in prison, id. at 45, but the law enforcement made no promises about his sentence.  3/11/14 Connolly testimony at101.  Norris had an emotional response to this information; he started to cry and shake his head and explained that he did not want to go to "the pen" (penitentiary) because one of his cousins had died in the pen.  3/11/14 Weindorf testimony at 46, 78. Weindorf talked to him about having an opportunity to cooperate

and that cooperation could have an impact on his sentencing and that the agent would bring any potential cooperation to the attention of the prosecutors. Id. at 46-47, 78-79. Norris indicated that he did not want a "script" (i.e., any record of cooperation) because "people in the pen who have scripts is a problem." Id. at 46.

At the end of the interview, Weindorf informed Norris that he did not believe that he was being honest and forthcoming and Norris indicated that he did not want to talk any more. 3/11/14 Weindorf testimony at 48, 80. Accordingly, the interview ended and Norris was returned to a holding cell. Id. at 48, 80. It had lasted until approximately 5:30 or 5:45 p.m. 3/11/14 Connolly testimony at 102. BPD arranged for Norris's transport to the Brookline Police Department, designated as a federal holding facility, and Norris was transported there, shortly after 7:30 p.m. for lodging. 3/11/14 Weindorf testimony at 50, 80; 3/11/14 Connolly testimony at 103.

### E.   Norris Has His Initial Appearance on Monday, April 1, 2013

On Monday, April 1, 2013, Weindorf and another federal agent transported Norris from the Brookline Police Department to the JFK Building for federal booking and then to the federal courthouse for his initial appearance. 3/11/14 Weindorf testimony at 50, 80-81. Norris had his initial appearance in this Court (Sorokin, J.) later that day and the Court appointed counsel for his representation. Id.; D. 17.

### III.        Discussion

### A.   There is No Legal Basis to Dismiss the Indictment

In his motion to dismiss, Norris seeks dismissal of the indictment for a violation of Fed. R. Crim. P. 5(a) or "in the alternative, [that] any statements made by the Defendant and any evidence derived from those statements should be excluded from evidence at trial." D. 80 at 2.

In relevant part, Rule 5(a)(1)(A) requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) [concerning the place of initial appearance] . . . ." Fed. R. Crim. P. 5(a)(1)(A); Corley v. United States, 556 U.S. 303, 306-08 (2009). Although any delay in presentment of the defendant to the Court may be considered in determining whether there is a basis to suppress Norris's statements to law enforcement, see Section B below, counsel for Norris has not cited any legal authority for such circumstances constituting a basis for dismissal. In the absence of same (and in light of counsel's agreement at the February 11, 2014 hearing that he could not cite any, but instead pressed the alleged Rule 5(a) violation for the purposes of demonstrating the involuntariness of Norris's Miranda waiver and statements to law enforcement), the Court DENIES the motion to dismiss.

**B. Any Delay in Bringing Norris Before A Magistrate Judge Does Not Require Suppression of His Statements If Such Statements Were Made Within Six Hours of His Arrest and Were Made Voluntarily**

Pursuant to 18 U.S.C. § 3501(c), "a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law enforcement officer or law enforcement agency, shall not be inadmissible solely because of delay in bring such person before a magistrate judge . . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention." Id.; Corley, 556 U.S. at 322 (noting that § 3501(c) "modified McNabb-Mallory [McNabb v. United States, 318 U.S. 332 (1943) and Mallory v. United States, 354 U.S. 449 (1957)] without supplanting it"). Accordingly, the Court must determine whether Norris's statements were made within six hours of his arrest (or, as not

applicable here, if outside of the six-hour window, any such delay was reasonable) and whether those statements were made voluntarily. Corley, 556 U.S. at 322.

### 1. Norris Made the Statements Within Six Hours of His Arrest on March 29, 2013

Norris does not seriously contest that any statements that he made to law enforcement were outside of the six-hour window of his arrest and the evidence does not suggest otherwise. The testimony from Connolly reflected that the interview of Norris began around 4 p.m. and on the Miranda form, that Norris acknowledged signing, Weindorf indicated that Norris signed it at 4 p.m. Exh. F; D. 92-6. Whether Norris's arrest was at 2 p.m. (as indicated on the booking form, Exh. E; D. 92-5) or at 2:30 p.m. (as indicated on the Miranda form, Exh. F; D. 92-6), his statements to Weindorf and Connolly occurred within six hours of this arrest as the testimony of the officers, which the Court credits, indicate that the interview concluded around 5:30 p.m. or 5:45 p.m., 3/11/14 Connolly testimony at 102, and that by 7:30 p.m., Norris had been transported to the Brookline Police Department for lodging. 3/11/14 Weindorf testimony at 50, 80; 3/11/14 Connolly testimony at 103.

Accordingly, since Norris made these statements within the six-hour window under § 3501(c), resolution of his motion to suppress turns upon whether his waiver of Miranda was voluntary and whether the statements he made to law enforcement after any such waiver were voluntary.

### 2. Norris's Statements were Made Voluntarily After a Voluntary Waiver of His Miranda Rights

#### a. Applicable Law

The Fifth Amendment and well settled law require that prior to a custodial interrogation, police must inform a person accused of criminal conduct of his right to remain silent; that his

statements may be used against him at trial; that he has a right to an attorney during questioning and that if he cannot afford an attorney, one will be appointed for him.  Miranda v. Arizona, 384 U.S. 436, 479 (1966);  United States v. Guerrier, 669 F.3d 1, 5 (1st Cir. 2011); see United States v. Gonzalez, 719 F. Supp. 2d 167, 170-71 (D. Mass. 2010) (discussing Miranda).  A defendant may knowingly, intelligently and voluntarily waive any of these rights,  id. at 170, but the burden is on the government to prove, by a preponderance of the evidence, that he did so.  Berghius v. Thompkins, 560 U.S. 370, 372 (2010) (noting that "[w]here the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent"); United States v. Andrews, 847 F. Supp. 2d 236, 246 (D. Mass. 2012).  A Miranda waiver is voluntary if it is "the product of free and deliberate choice rather than intimidation, coercion, or deception."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  Such waiver must involve "uncoerced choice" and "the requisite level of comprehension" by the individual for the Court to determine that there has been a knowing, intelligent and voluntary waiver of Miranda rights.  Id.  That, a defendant must be aware of the nature of the rights he is waiving and the consequences of that waiver.  United States v. Childs, 2008 WL 941779, at *12 (D. Mass. April 4, 2008).  "[A]n express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'"  United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986) (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979); see United States v. Ramos, 591 F. Supp. 2d 93, 114 (D. Mass. 2008).

Moreover, a defendant's incriminating statements to police must be also be made voluntarily.  Dickerson v. United States, 530 U.S. 428, 432-33 (2000);  Jackson v. Denno, 378 U.S. 368, 380 (1964).  The voluntariness of a defendant's admission "depends on whether the

will of the defendant was overborne so that the statement was not a free and voluntary act."

United States v. Massaro, 560 F. Supp. 2d 96, 106 (D. Mass. 2008) (citing Procunier v. Atchley, 400 U.S. 446, 453 (1971)); Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986). The determination of same involves a consideration of the "totality of the surrounding circumstances…including the characteristics of the accused and the details of the interrogation." Massaro, 560 F. Supp. 2d at 106; see United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) (noting that such circumstances include "age, education, experience, intelligence, and knowledge of the right to withhold consent") (internal citation and quotation marks omitted). As with the showing of the voluntariness of any Miranda waiver, the burden is also on the government to show the voluntariness of a defendant's statements. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

**b. Norris's Waiver of Miranda Rights**

Norris contends that the government has failed to meet its burden of proving that he freely, knowingly and voluntarily waived his Miranda rights. The Court disagrees and addresses each of his contention in turn. First, Norris testified that he was under the influence of marijuana (having smoked a number [6] of "blunts" earlier in the day on March 29th) during the interview. However, Norris did not share this information with the agents during the course of the interview (although he claimed to have said so to the booking officer, 4/9/14 Norris testimony at 38-39) and neither officer had any concerns about his sobriety during the interview, see 3/11/14 Connolly testimony at 101, although Norris claimed that he was high and tired during the interview. 3/11/14 Norris testimony at 146. Norris did not appear tired or groggy during the

---

[6] At the hearing, Norris testified that on March 29th, between waking up around 10 or 10:30 a.m. and his arrest later that day, he had smoked four to five blunts (i.e., marijuana laced with PCP). 3/11/14 Norris testimony at 141. His earlier affidavit attested that he had "smoked three or four marijuana 'blunts' between 12:00 p.m. and 1:30 p.m." D. 82-1.

interview, 3/11/14 Weindorf testimony at 80, but coherent and conversational. He also provided information and details about a number of events relating to the investigation without any apparent difficulty in comprehension (as evidenced by false exculpatory statements relating, for instance, to his initial denial about being at a Providence hotel with the victim until shown video surveillance photographs) or with his memory.[7] That is, even if I credit Norris's testimony that he had smoked blunts earlier in the day, I credit the testimony of the officers that he was not impaired. United States v. Palmer, 203 F.3d 55, 61 (1st Cir. 2000) (affirming ruling that Miranda waiver was voluntary where defendant claimed heroin withdrawal and use of antidepressant medication in part because the "defendant's tone, clarity, and detailed recall of the [crime] as set forth in the confession supported a finding of lucidity").

Second, Norris argues that the delay in his appearance in court contributed to the involuntariness of his Miranda waiver. Even if a defendant gives a confession within the six-hour window, the Court must still decide if such statement was voluntary. United States v. McDowell, 687 F.3d 904, 909 (7th Cir. 2012). Here, Norris's statements were made within the six hours and there was nothing nefarious about the timing of the arrest and subsequent initial appearance. Certainly the agents had a particular interest in speaking with Norris after his arrest, but neither Weindorf nor Connolly was aware that Norris would be arrested on Friday afternoon. Weindorf was aware that with a 2 p.m. arrest in West Roxbury by BPD officers not involved in the investigation, the U.S. Marshal's policy of not accepting prisoners after 3 p.m., the agency requirements of a separate federal booking prior to initial appearance and traffic in the city at that time of day, it would take some time to get Norris to the federal courthouse and, under these

---

[7] In fact, toward the end of the interview, Norris was also able to complete an abandonment form for the $640 on his person at the time of his arrest that he conceded was drug money. 3/11/14 Weindorf testimony at 47-48.

circumstances, it was not improper for the government to have sought permission for Norris to be lodged over the weekend.

Norris further contends that Weindorf and Connolly mislead him about when he would get to court for his appearance before a judge and get counsel appointed. Specifically, Norris testified that during the interview with Weindorf and Connolly that Weindorf told him that after their conversation (and after he had signed the Miranda form), they would bring him to court. 3/11/14 Norris testimony at 146, 147, 148. He also claimed that they told him that he would get an attorney in court. 3/11/14 Norris testimony at 147. Norris argues that these statements, particularly against the backdrop of the magistrate judge's provisional appointment of counsel (in conjunction with the permission to lodge Norris over the weekend), D. 28, amounted to a violation of his 6th Amendment right to counsel or, at minimum, contributes to showing that any waiver of Miranda rights was not voluntarily made. As the government correctly points out, D. 100 at 5, any appointment of counsel for Norris could not occur until there was a judicial determination of qualification for same. 18 USC § 3006A(b) ("the United States magistrate judge or the court, if satisfied after appropriate inquiry that the person is financially unable to obtain counsel, shall appoint counsel to represent him"). The Court was not able to make that inquiry and appoint counsel until Norris made his initial appearance the following Monday, April 1, 2013. D. 17. Moreover, to the extent that Norris argues that it was at least misleading that the agents did not share the "provisional" appointment of counsel with Norris when he inquired about same, the Court credits the officers' testimony that neither was aware of such "provisional" appointment at the time of the interview. 3/11/14 Weindorf testimony at 28, 58, 60; 3/11/14 Connolly testimony at 131. Most significantly, the analysis of whether Miranda rights freely, knowingly and voluntarily made is the same whether Norris was represented or

unrepresented by counsel. <u>Montejo v. Louisiana</u>, 556 U.S. 778, 798 (2009). That is, a "defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." <u>Id.</u> at 786. Accordingly, whether any "provisional" appointment of counsel means that Norris was represented by counsel at the time of his interview, does not change the relevant analysis: whether Norris was advised his <u>Miranda</u> rights (including his 6th Amendment right to counsel) and whether he freely, knowingly and voluntarily agreed to waive them. <u>Id.</u> at 789-92, 798.

Having considered the totality of circumstances, the Court concludes that Norris waived his <u>Miranda</u> rights freely, knowingly and voluntarily and agreed to speak with the officers. Although Norris testified that he left school in the eleventh grade, had a special education plan in school and had a hard time reading, 3/11/14 Norris testimony at 139, he was no stranger to the criminal justice system. Exh. S; 3/11/14 Weindorf testimony at 35-36. He had been arrested on approximately seventeen prior occasions. 3/11/14 Connolly testimony at 108; <u>see</u> 3/11/14 Norris testimony at 142. Despite this history, Norris testified, somewhat inexplicably, that he had never had <u>Miranda</u> rights read to him. 4/9/14 Norris testimony at 31-32. Norris did initially acknowledged understanding that he had a right to remain silent and that counsel would be appointed for him, if he could not afford one, 4/9/14 Norris testimony at 34, but then said that he was too high to understand those rights on March 29th. 4/9/14 Norris testimony at 34. Moreover, Norris acknowledged signing the <u>Miranda</u> waiver form. Although such a signed form is not dispositive of whether such waiver was voluntarily given, it is strong evidence of same, particularly where Norris was asked and did initial each of the <u>Miranda</u> rights after they were read to him and then signed the waiver and the Court credits Weindorf's testimony that he pointed out the waiver provision to Norris and observed him read that section of the form. To

extent that Norris claims that he did not understand the waiver provision or that the agents mislead him about what he was signing (or what would happen after he signed it), the Court does not credit such testimony. Having considered the testimony concerning the circumstances surrounding the waiver and the waiver form, the Court concludes that Norris waived his <u>Miranda</u> rights freely, knowingly and voluntarily.

### c. Norris Voluntarily Made Statements to the Law Enforcement Agents

The Court also concludes, based upon the totality of the circumstances, that Norris voluntarily made his statements to the agents during the March 29th interview. There is nothing about the circumstances of that interview that suggests that Norris's will was overborne or that his statements were not the product of uncoerced choice.

As noted above, as attested to by Weindorf and Connolly, the interview was conducted in a normal, conversational tone[8] and lasted less than two hours. Although Norris claimed to have smoked marijuana earlier in the day, there was no credible evidence that his understanding of the questions or the nature of the inquiry was impaired. <u>See</u> <u>United States v. Palmer</u>, 203 F.3d 55, 61 (1st Cir. 2000) (noting that even if the defendant, *"arguendo*, was in a weakened condition because of his withdrawal symptoms, it does not necessarily follow that his post-arrest statements were involuntary" since "[i]n the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness"). There was credible testimony from Weindorf and Connolly that Norris made a few false exculpatory statements (i.e., his presence at the Providence hotel with the victim, the involvement of a co-defendant), minimized his role in the crime until shown a video surveillance photograph and expressed concern and emotion when

---

[8] To the extent that Norris claimed late in his cross-examination that Weindorf was yelling at him during the examination, 4/9/14 Norris testimony at 61, the Court does not credit this portion of his testimony.

informed of the substantial prison sentence he would be facing if convicted. These circumstances and observations evidenced not coercion, but a growing awareness of the seriousness of his situation.

To suggest that the circumstances were coercive, Norris makes much of the fact that Weindorf suggested that the victim was still missing (when they were, in fact, aware of her whereabouts) and suggesting that she was dead. Norris acknowledged that Weindorf never said that the victim was dead, 4/9/14 Norris testimony at 50, and Weindorf denied saying so. However, even if the agents were not forthcoming about the victim's whereabouts or the fact that they were aware of her whereabouts, the Supreme Court has noted that it has "never read the Constitution to require that the policy supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Colorado v. Spring, 479 U.S. 564, 576-77 (1987); see United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (denying remand and noting that even "trickery is not automatically coercion"). That was certainly the circumstance here where it cannot be concluded that the agent's statements (or lack thereof) about the victim's whereabouts had a coercive effect, particularly in light of the credible evidence of the circumstances of the interview and the agents' conduct otherwise during the interview.

Finally, there was nothing inappropriate or coercive about the agents' discussion with Norris about the possible criminal penalties if he were convicted or the prospect of his cooperation with law enforcement. This record does not reflect any improper inducements by the agents to Norris. Weindorf informed Norris that he was facing felony charges and fifteen years in prison, 3/11/14 Weindorf testimony at 45, but neither agents made any promises about his sentence, but only that they would bring any cooperation to the attention of the prosecutors

and that it could have an effect on his sentence.  3/11/14 Weindorf testimony at 46-47, 78-79. Both statements are accurate:  there is a fifteen-year minimum mandatory sentence for sex trafficking of a child under 18 U.S.C. § 1591(a) and (b)(1) as charged in Count 2, D. 3 at 3, but 18 U.S.C. § 3553(e) (giving the court "the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance") permits the Court, on the government's motion, to depart from that statutory mandatory minimum sentence for substantial assistance provided by a defendant.  Moreover, Norris's reaction to this information--that he did not want a "script" (i.e., any record of cooperation) because "people in the pen who have scripts is a problem"  3/11/14 Weindorf testimony at 46-- suggests not a coercive effect on Norris, but a defendant's informed understanding of the benefits and burdens of cooperation with law enforcement.

## IV.    Conclusion

For the foregoing reasons, the Court DENIES the motion to dismiss, D. 80, and DENIES the motion to suppress, D. 82.


**So Ordered.**

/s/ Denise J. Casper
United States District Judge